# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF NORTH CAROLINA
# CHARLOTTE DIVISION
# DOCKET NO: 3:09-CR-93-FDW-DCK

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| v. ) | **MEMORANDUM AND** |
| ) | **RECOMMENDATION** |
| DARRELL RICARDO LEWIS, ) | |
| ) | |
| Defendant. ) | |
| ) | |

**THIS MATTER IS BEFORE THE COURT** on Defendant Darrell Ricardo Lewis' "Motion To Suppress Evidence And Statements" (Document No. 11) filed on January 17, 2010, and "Amended Motion To Suppress Evidence And Statements" (Document No. 12) and "Memorandum In Support Of Motion To Suppress Evidence" (Document No. 13) filed on January 18, 2010. The United States filed its "Reply To Defendant's Motion To Suppress And Request For Evidentiary Hearing" (Document No. 16) on January 27, 2010 in opposition to Defendant's motion. "Defendant's Supplemental Memorandum In Support Of Defendant's Motion To Suppress" (Document No. 18) was filed on March 6, 2010. An evidentiary hearing was held before the undersigned on March 12, 2010, with Defendant personally present with counsel. Having fully considered the briefs, testimony, evidence, and oral arguments, the undersigned will respectfully recommend that Defendant's motions be denied.

## I. FACTUAL BACKGROUND AND FINDINGS

On May 19, 2009, a "Bill of Indictment" (Document No. 1) and "Warrant For Arrest" (Document No. 2) were issued charging Defendant Darrell Ricardo Lewis ("Defendant" or "Lewis") with unlawful possession of a firearm pursuant to 18 U.S.C. § 922(g)(1) and 924(e). Subsequently,

Lewis has moved to suppress evidence and statements that led to his indictment and arrest. (Document Nos. 11 and 12). The arguments, testimony, and evidence submitted at the hearing on the motions to suppress on March 12, 2010, established the following pertinent facts, which are largely undisputed:

On August 7, 2008, at approximately 11:45 PM, Charlotte-Mecklenburg Police Officers Brian Carey and Jeff C. Wheaton were patrolling together in a marked patrol vehicle on Central Avenue in Charlotte, North Carolina, an area known to be a high-crime location. The officers observed a green 1996 Toyota Tercel sedan with an inoperable tag light. As the officers approached, the vehicle changed lanes and made an abrupt turn into the gas station at 1920 Central Avenue. The officers pulled in behind the vehicle and turned on their blue lights. As soon as the vehicle stopped, the driver, later identified as Darrell Ricardo Lewis, opened his door and began to exit the vehicle.

Officer Carey quickly exited the patrol vehicle and approached the driver. Officer Wheaton approached the passenger side door and confronted the front seat passenger, later identified as Houston Steven Harrelson ("Harrelson"). Approaching the vehicle, Officer Carey noticed a "walky-talky" and a variety of other tools in the vehicle. Officer Carey also noticed that the driver was a black male and the passenger was a white male.

The driver and passenger presented the officers with North Carolina non-driving license identification cards. Officer Carey had Lewis exit the vehicle and conducted a quick visual search of him for weapons. No weapons or contraband were apparent on his person. Officer Carey then had Lewis stand unrestrained at the back of his vehicle, and just in front of the patrol car, about seven or eight feet from the driver's side door. Officer Carey observed signs of nervous behavior by Lewis: fidgeting, sweating, shifting his weight, and possibly looking around for an avenue of

2

escape. Officer Carey ran a check of the identification cards, and he learned that the Defendant's driver's license was suspended and that he had a criminal history including numerous arrests for drug, breaking and entering, and weapons violations. Harrelson's record revealed arrests for breaking and entering and drug offenses. The officers also learned that the vehicle belonged to a Ronald Allison Brooks, who was not present.

In his initial conversation with Lewis, Officer Carey was unable to gather a clear understanding from Lewis of who owned the vehicle or where Lewis and his passenger were going or had been that evening, and he generally found Lewis' statements unreliable. Lewis was also unwilling or unable to identify the passenger in the vehicle he was driving.

Based on the totality of the circumstances, Officer Carey testified that at that time, less than ten minutes since the stop began, he believed that Lewis would be going to jail for driving with a revoked license. He did not however inform Lewis that he was under arrest at that time. Officer Carey requested consent to search the vehicle and was told by Lewis that he was not able to give consent because it was not his vehicle.

Officer Carey then approached the car again and informed Lewis he was primarily concerned about guns in the vehicle. Upon a brief search, he found a loaded .40 caliber pistol under the driver's seat. Officer Carey left the gun under seat and signaled to Officer Wheaton that Lewis would be going to jail. He then approached Lewis under the premise of a further search of his person, handcuffed him, and informed him he was under arrest. After securing the gun, Officer Carey read Lewis his <u>Miranda</u> rights from a card. When asked by Officer Carey whether he understood his rights, Lewis responded that yes, he understood.

On further search of the vehicle, Officer Carey found a bag with CDs, reciprocating saw blades, and .40 caliber ammunition of the same type found in the gun under the seat. Lewis admitted ownership of the bag and its contents, with the exception of the ammunition. The officer also found ski masks, gloves, another walky-talky, a reciprocating saw, a camouflage jumpsuit and bolt cutters. Lewis specifically denied ownership of the gun found in the vehicle, but admitted seeing it earlier in the day and suggested that another person must have left it there.

Harrelson was released at the scene of the stop. At Defendant's request, the officers parked the vehicle Lewis had been driving at the gas station and then proceeded to take him to the police station in the back of the patrol car.

On the way to the jail, Lewis repeatedly stated that he "could not take the gun charge," that he wanted to strike a deal, and that he had information that might be valuable to the officers. Approximately one block north of the Mecklenburg County jail, the officers obliged Defendant's request to stop and speak further. The officers told Lewis that they could only help him if he was straightforward and honest. They further told him that they could not make any guarantees about an outcome, but that if he was cooperative and agreed to provide substantial assistance, they would make a recommendation to the District Attorney about the charges.

Lewis executed an "Adult Waiver of Rights" form ("Government's Exhibit 2"), which he initialed and signed in the back of the patrol car at about 2:07 A.M. on August 8, 2008. Officer Carey then transcribed a handwritten statement on an "Adult Voluntary Statement" form ("Government's Exhibit 3"), which Officer Carey read back to Lewis, and which Lewis signed at approximately 2:11 A.M.

The Adult Voluntary Statement reads as follows:

> I, Darrell Ricardo Lewis, know and understand my rights. Having decided to answer questions at this time, I now make the following statement:
>
>> I was riding in a green Toyota Tercel with my friend Steve. The police stopped us at the gas station on Central Ave. Officer Carey searched my car and found a loaded .40 caliber pistol under my seat. The gun was mine and I bought it about two weeks ago for $300.00. I have shot the gun but it was in some woods away from everything. I have been convicted of felonies and I was told I could not have handguns. This Statement is true and accurate.
>
> The statement above . . . is made of my own free will. No one has threatened in any way or promised me special treatment to cause me to make this statement. I am signing my name in the space below to show that it is _my_ statement and that it is the truth.

(Government's Exhibit 3). The statement was signed in two places by Lewis and witnessed by Officer Carey. The officers booked Lewis only on a charge of driving with a revoked license.

Lewis now moves the Court to suppress any evidence seized from the vehicle driven by him on August 7, 2008, as being the result of an illegal search and seizure, and to suppress any incriminating statements made by Lewis on August 7-8, 2008, as such statements were not knowingly and intelligently made and were obtained in violation of his Fifth Amendment right to remain silent. Further, Lewis contends his statements were not freely and voluntarily made because the agents induced the statements by false promises of benefit to Defendant.

## II. DISCUSSION AND CONCLUSIONS

The issues raised by Lewis for immediate review are whether: 1) Officer Carey and Wheaton's stop of Lewis on August 7, 2008, was proper; 2) the subsequent search of the Toyota

5

Tercel driven by Lewis was valid; and 3) whether Lewis' statements must be suppressed as either coerced by the police or otherwise obtained in violation of his Fifth Amendment rights.

**A.  The Stop**

Lewis first contends that the stop of his vehicle by Officers Carey and Wheaton was improper, and therefore, all evidence seized and statements taken thereafter are fruit of the poisonous tree and should be suppressed. Specifically, in his motion, Lewis alleges that he was "pulled over in a pretextual stop on August 7, 2008." To the contrary, the undersigned concludes that the traffic stop was proper.

A vehicle stop is usually permitted only upon reasonable and articulable suspicion of unlawful conduct. See, e.g., United States v. Arvizu, 534 U.S. 266, 273-75 (2002) (approving vehicle stop based on "reasonable suspicion"). Whether there is "reasonable suspicion" in a particular case depends on the totality of the circumstances, including the information known to the officer and any reasonable inferences to be drawn at the time of the stop. Id.; United States v. Crittendon, 883 F.2d 326, 328 (4th Cir. 1989). A trial court's determination of "reasonable suspicion" is reviewed *de novo*; however, the appellate court should "give due weight to inferences drawn from those facts by resident judges and local law enforcement officers." Ornelas v. United States, 517 U.S. 690, 699 (1996).

Here, in his very credible testimony, Officer Carey stated that he observed the Defendant's green 1996 Toyota Tercel sedan driving with an inoperable tag light, a violation of N.C.G.S. § 20-129(d). The fact that the tag light was in fact inoperable was uncontroverted. Officer Carey also testified that, as he and Officer Wheaton approached in their police cruiser, the Defendant's vehicle changed lanes and made an abrupt turn into a gas station. In short, Officer Carey's observations

6

constituted "reasonable suspicion" to stop the vehicle, and the defendant's argument is therefore without merit.

**B.     Search Of The Vehicle**

Lewis contends that he had "a Fourth Amendment right to be free from unlawful searches and seizures of the automobile he was driving" and that "but for the search of the automobile, Lewis would not have been indicted on the underlying gun possession charge." (Document No. 13 at p.6). Lewis argues that he refused to give consent to search and that the search without a warrant was unjustified.

A person's right to be free from unreasonable searches and seizures arises from the Fourth Amendment to the United States Constitution, which specifically provides:

> The right of people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Constitution, Amend. IV. A person claiming the protection of the Fourth Amendment must have "a legitimate expectation of privacy in the invaded place." Rakas v. Illinois, 439 U.S. 128, 143 (1978). "[T]his Court has recognized significant differences between motor vehicles and other property which permit warrantless searches of automobiles in circumstances in which warrantless searches would not be reasonable in other contexts." Id. at 154.

Based on the evidence presented at the hearing, it appears that the officers conducted a valid protective search of the vehicle. The Supreme Court has opined that

> protection of police and others can justify protective searches when police have a reasonable belief that the suspect poses a danger, that roadside encounters between police and suspects are especially

> hazardous, and that danger may arise from the possible presence of weapons in the area surrounding a suspect. These principles compel our conclusion that the search of the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden, is permissible if the police officer possesses a reasonable belief based on "specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant" the officers in believing that the suspect is dangerous and the suspect may gain immediate control of weapons.

Michigan v. Long, 463 U.S. 1032, 1049 (1983); see also, United States v. Griffin, 589 F.3d 148, 153 (2009)("In order to conduct a lawful protective search of a stopped vehicle under Long, an officer must possess a reasonable belief of both (1) the suspect's dangerousness and (2) the possibility that the suspect might gain immediate control of any weapons inside the vehicle.") citing United States v. Holmes, 376 F.3d 270, 276 (4th Cir. 2004). Furthermore, "a protective search is authorized even if the suspect is under police restraint at the time the search is conducted, because the suspect may be able to escape such restraint, or may later gain access to the vehicle if he is not arrested." United States v. Elston, 479 F.3d 314, 320 (2007) citing Long, 463 U.S. at 1051-52; Holmes, 376 F.3d at 280.

  Officer Carey has provided credible testimony to the Court that based on the totality of the circumstances he believed Defendant's behavior was suspicious and he posed a potential danger. Officer Carey testified that his decision to conduct a "safety frisk of the interior of the car" was based on circumstances that included: 1) a missing tag light which could be construed as a driver's attempt to evade detection; 2) the Defendant's abrupt turn into the gas station; 3) the lateness of the hour; 4) a known high crime area of town; 5) the Defendant's apparent attempt to quickly exit the vehicle after the stop; 6) the fact that the driver and his passenger fit the description of a "salt and pepper" crew known to be involved in criminal activity in the neighborhood; 7) observation of tools in the

vehicle that might be used for breaking and entering; 8) Defendant's nervous behavior; 9) Defendant's vague responses regarding where he was coming from, going, and who he was with; 10) the fact that the vehicle did not belong to either occupant; 11) a driver with a revoked license; and 12) vehicle occupants with backgrounds consisting of numerous arrests for drug, breaking and entering, and weapons violations.

Based on the foregoing factors it was reasonable for Officer Carey to believe that Lewis might be dangerous and might have immediate access to a weapon in the vehicle.

> In evaluating the validity of an officer's investigative or protective conduct under Terry, the "[t]ouchstone of our analysis ... is always 'the reasonableness in all circumstances of the particular governmental intrusion of a citizen's personal security.'" In this case, the officers did not act unreasonably in taking preventive measures to ensure that there were no other weapons within Long's immediate grasp before permitting him to reenter his automobile. Therefore, the balancing required by Terry clearly weighs in favor of allowing the police to conduct an area search of the passenger compartment to uncover weapons, as long as they possess an articulable and objectively reasonable belief that the suspect is potentially dangerous.

Long, 463 U.S. at 1051 (internal citations omitted).

Lewis contends that the government's position ignores the recent Supreme Court holding in Arizona v. Gant, 129 S.Ct. 1710 (2009). (Document No. 18 at p.2). However, Lewis has previously and correctly noted that "Gant [is] distinguishable from the case *sub judice* as Lewis had not been arrested and had not been told he was under arrest." (Document No. 13 at p.7). Gant "explicitly limited its holding to the search-incident-to-arrest context . . . 'In the no-arrest case, the possibility of access to weapons in the vehicle always exists, since the driver or passenger will be allowed to return to the vehicle when the interrogation is completed.'" United States v. Vinton, 594 F.3d 14, 24 n.3 (D.C.Cir. 2010) quoting Gant, 129 S.Ct. at 1724.

The undersigned is convinced based on the evidence presented that Lewis was not under arrest at the time of the initial search that uncovered the gun. Even if Officer Carey believed at the time of the search that Lewis was or would soon be under arrest, his subjective views "have no bearing on whether the detention constitute[d] an arrest." United States v. Elston, 479 F.3d 314, 319 (4th Cir. 2007). "Rather, an arrest is defined using an objective standard: whether 'the suspect's freedom of action is curtailed to a degree associated with formal arrest.'" Id. quoting Park v. Shiflett, 250 F.3d 843, 850 (4th Cir. 2001).

The search of the vehicle was appropriate based on the totality of the circumstances and the officers' reasonable belief that the suspect was: 1) dangerous, and (2) might possibly gain control of any weapons inside the vehicle. See Griffin, 589 F.3d at 153. Moreover, at the time of the initial search, there was still a passenger in the vehicle who might also have reasonably been considered dangerous and within immediate reach of any weapons inside the vehicle.

### C. Defendant's Statement

Lewis also moves to suppress his statements made the night of August 7-8, 2008, because he was not properly *Mirandized* and was coerced. Pursuant to Miranda v. Arizona, 384 U.S. 436 (1966), a defendant may waive his constitutional rights only if the waiver is made voluntarily, knowingly and intelligently. The Fifth Amendment secures an individual's privilege against self-incrimination. Under Miranda, any statement given is presumed involuntary unless the officer gives the following warnings: 1) that the suspect has a constitutional right to remain silent; 2) that anything he says can and will be used against him in court; 3) that he has the right to confer with counsel before answering any questions and to have counsel present during the questioning itself; and 4) that if he is indigent he has a right to have appointed counsel present. Id. at 467-473.

> The inquiry into whether an individual waived effectuation of the rights conveyed in the Miranda warnings has two distinct dimensions. First, the relinquishment of the right "must have been voluntary in the sense that it was the product of free and deliberate choice rather than intimidation, coercion, or deception." Second, "the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived."

United States v. Cristobal, 293 F.3d 134, 139-40 (4th Cir. 2002)(internal citations omitted) quoting Moran v. Burbine, 475 U.S. 412, 421 (1986).

Here, credible testimony and evidence support a finding that Lewis was informed of and waived his Miranda rights on two separate occasions – once while being arrested at the gas station, and a second time in the patrol car approximately a block from the police station. The second time Lewis actually executed a written "Adult Waiver Of Rights" ("Exhibit 2") form where he marked his initials indicating his understanding of each of the necessary Miranda warnings cited above and then signed the document.

Nevertheless, Lewis now contends that the incriminating statements he made regarding the ownership and possession of a firearm were not freely, voluntarily, knowingly and intelligently made and thus violated his Fifth Amendment right not to incriminate himself. Specifically, he challenges the admissibility of the written statement described above - Government's Exhibit 3. Lewis argues that he was pressured and coerced by the officers into giving this statement. While the undersigned acknowledges that the evidence presented suggests that the Defendant's statement was produced during an intense period of time on the way to jail, it also suggests that Lewis himself initiated the conversation in an attempt to avoid gun charges. It is evident that Lewis was very concerned,

without any pressure from the officers, on the effect of being booked on a gun charge with his criminal history.

In exchange for Defendant's statement, as well as an agreement to provide substantial assistance to the officers, Officer Carey agreed not to include the weapon possession charge at booking. Defendant's statement was given and signed within approximately four minutes of executing the written waiver of his rights. Furthermore, it appears that per the agreement Lewis was only charged by the arresting officers with driving with a revoked license on August 8, 2008. The current federal indictment was filed over nine months later – after a significant passage of time, and presumably other events that are not before the Court for review.

Consistent with the dictates of Cristobal, and viewing the totality of the circumstances, the undersigned is satisfied that the evidence supports a finding that Lewis voluntarily, knowingly and intelligently waived his Miranda rights and executed his statement. To the extent there was pressure, it appears to have been primarily of the Defendant's own making, and not police coercion. Understandably, Lewis did not want to face charges related to illegally possessing a weapon and successfully struck a deal with the police officers to initially avoid those charges. Defendant's clear concerns in the evidence presented regarding the charges he was facing and the possible consequences of those charges further support a finding that he voluntarily, knowingly, and intelligently made his statement.

The undersigned notes that the testimony given by Officer Carey in this matter was very credible, and that Defendant's testimony was far less convincing. In fact, Defendant's testimony included an admission that he had not been truthful with the officers regarding ownership of the gun.

In conclusion, the undersigned does not find the Defendant's arguments persuasive. Lewis has failed to support his claims of constitutional violations, or any other grounds for suppression. The undersigned will respectfully recommend a finding that both the stop and the vehicle search in this case were appropriate and that the subsequent statements by Lewis are admissible.

### III. RECOMMENDATION

**IT IS, THEREFORE, RECOMMENDED** that the Defendant's "Motion To Suppress Evidence And Statements" (Document No. 11) and "Amended Motion To Suppress Evidence And Statements" (Document No. 12) should be **DENIED**.

### IV. NOTICE OF APPEAL RIGHTS

The parties are hereby advised that, pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72 of the Federal Rules of Civil Procedure, written objections to the proposed findings of fact, conclusions of law, and recommendation contained herein must be filed within fourteen (14) days of service of same. Page v. Lee, 337 F.3d 411, 416 n. 3 (4th Cir.2003); Snyder v. Ridenour, 889 F.2d 1363, 1365 (4th Cir.1989); United States v. Rice, 741 F.Supp. 101, 102 (W.D.N.C. 1990). Failure to file objections to this Memorandum and Recommendation with the District Court constitutes a waiver of the right to *de novo* review by the District Court. Diamond v. Colonial Life, 416 F.3d 310, 315-16 (4th Cir.2005); Wells v. Shriners Hosp., 109 F.3d 198, 201 (4th Cir.1997); Snyder, 889 F.2d at 1365. Moreover, failure to file timely objections will preclude the parties from raising such objections on appeal. Thomas v. Arn, 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986); United States v. Schronce, 727 F.2d 91 (4th Cir.), cert. denied, 467 U.S. 1208 (1984).

The Clerk is directed to send copies of this Memorandum and Recommendation to counsel for the parties and the Honorable Frank D. Whitney.

**IT IS SO RECOMMENDED**.

Signed: March 24, 2010

David C. Keesler
United States Magistrate Judge